Gilmore, J.
It has heretofore been decided in this case,, that as between the Second National Bank and Hemingray,, no legal right to set-off existed in favor of the latter. 31 Ohio^St. 168.
We were not aware, at that time, that it was necessary to consider the equitable defenses made by the pleadings in the case, not knowing that the collaterals held by the bank, as security for Homans’ indebtedness to it, would be more than sufficient to satisfy such indebtedness.
But we are now advised, that pending the litigation in this case, the bank collected all the other available col-laterals that it held and applied the proceeds as payments upon the debts secured by them; and that, since the former decision, the bank has collected from Hemingray, on his notes which it held as collaterals on Homans’ indebtedness-to it, a sum sufficient to satisfy the balance of the debt, and that there still remains unpaid, upon Hemingray’s notes, several thousand dollars to which the bank has no claim, it now being simply the holder of the notes for the benefit of the parties interested in the balance remaining unpaid upon them.
Hemingray claims that he is entitled, in equity, to set-off against such balance, certain claims which he alleges he holds against Homans.
The assignees in bankruptcy of Homans claim the bal *386 anee due upon the notes for the benefit of his creditors. They are now the only parties to the principal controversy.
Only the facts necessary to an understanding of the point then decided were stated in the previous report of the case; and a further statement of the facts becomes necessary to an understanding of the grounds upon which the equities of the parties depend.
As disclosed by the record, they are substantially these:
Homans was doing a banking business in Cincinnati, in the name of B. Homans, Jr. & Co., but in fact it was Ho-mans alone, for he had no partner or partners in the business. Hemingray, Evans, aud Eoley were partners, as R. Hemingray & Co., and were engaged in a manufacturing business in Kentucky, having a sale and business house in Cincinnati. Ilemingray’s interest in the firm was five-eighths, and Evans’ and Eoley’s each three-sixteenths, and they each owed Hemingray about $1,900, on account of the purchase of their interest in the firm. Hemingray attended exclusively to the manufacturing establishment in Kentucky, while Evans took the supervision of the house and business in Cincinnati.
It does not appear that Hemingray and Homans had any 'business transactions with each other previous to July, 1868. On the 11th of July, 1868, Hemingray purchased of Homans real estate, situate in Kentucky, at the price of $17,000, and gave his notes, bearing interest therefor as follows; one for $5,000 in ninety days, and three for $4,000, •each due in one, two, and three years from date respect- • ively, the last three of which are now in controversy. Erom the date of that transaction, at least, if not before, the only bank account of the firm of R. Hemingray & Co. was kept with Homans, in Cincinnati, in the firm name, and in addition to the firm business, which was done through this account, all the individual collections of Hemingray were also made, and all his individual liabilities were also paid by checks drawn on the firm account, Hemingray having no individual bank account anywhere. *387 The first note, of $5,000, was paid to Homans at its maturity, by a check drawn by Evans on the firm account, Homans voluntarily making a rebate of part of the interest that had accrued on the note, on account of the firm deposits, with which the note was paid, having been some time in his bank.
On the 31st of Mlay, 1869, Homans assigned and pledged the three remaining notes to the Second National Bank, as collateral security oil a loan, of which fact Hemingray was not advised till after Homans’ suspension, as will be more fully stated hereafter. The usual bank notice of the maturing of the second note, on the 14th of July, 1869, was sent by Homans from his bank to R. Hemingray & Co. After receiving the notice, and -before the note fell due, Evans, after consultation with Hemingray, went to Ho-mans’ bank, and stated to him that his firm was building, and might need their funds for that purpose, and proposed to pay the interest then due on the note, and renew it for a short time; but if it would not suit Homans to do so, he would pay it by a check, on the firm account. Homans said it was all right, that the note could lie over without payment of interest or renewal as a call loan, with an understanding “ that they should go on and deposit there and lift the note at any time.” The usual banking transactions continued between the parties from the date of that arrangement, till 10 o’clock a. m., August 26, 1869, when Homans suspended and closed his bank.
At that date there was deposited in the bank, to the firm account of R. Hemingray & Co., $9,425.89, which had been reported to them, and in addition thereto the sum of $266.30, the proceeds of a collection of which they had not been notified. Homans had also held, for collection, the note of T. J. Allen, for $1,000, which was the individual property of R. Hemingray. Homans had sent this note to the First National Bank of Covington, for collection, when it was collected and credited to Homans’ account on the day of his failure, and reported to Hemingray and Co., by Homans, on the next day, and the *388 amount credited to their account in pursuance of the usual course of dealing between the parties.
Captain Evans, the managing partner in Cincinnati, of the firm of R. Hemingray & Co., had an individual deposit account in Homans’ bank, on which there was, at the time the bank was closed, a balance of $1,803 in. his favor. This account was in no way connected with the business of the firm, but was kept in connection with, and in closing up the steamboating business in which Captain Evans had been engaged before becoming a member of the firm of R. Hemingray & Co.
Hemingray & Co. first heard of Homans’ failure between twelve and one o’clock, on the day it occurred. They immediately took the advice of counsel, and then transferred the amount due them on the firm account, in the bank, of which they had knowledge, being $9,425.89, to Hemingray, individually, by a check for the amount, which was charged to him on the books of the firm, and for which, it is understood between the members, he is unconditionally liable to the firm, and a like check was given for the $266.30, when they were advised of its collection, on the next day. At the same time (August 26) Captain Evans transferred to Hemingray the balance due on his account ($1,803) in the bank, to be used by the latter as a set-off against his notes, then supposed to be in Homans’ hands; and Captain Evans does not expect to hold Hemingray for the amount unless the set-off is allowed to be made.
Shortly after obtaining the checks, probably between tw7o and three o’clock, p. m., Hemingray went to Homans’ bank for the purpose, but did not present the checks, because “ the house was shut up.” About 'four o’clock, p. m. of the same day, Hemingray went to Homans’, in Covington, and then learned from him that the notes in controversy had been transferred to the Second National Bank, which was the first knowledge or intimation that he or his firm had of the fact. Between seven and eight o’clock, on the same evening, Homans made an assignment to Theodore Cook, under the state insolvent law; and afterward, on the 13th of Sep *389 tember following, he was forced into bankruptcy, and his trustees are parties to the controversy here.
On this general statement of facts, in connection with such as maybe specially stated hereafter, the equitable rights of the parties depend.
The legal title to the notes being in the Second National Bank at the time of the assignment in bankruptcy, the assignees thereby succeeded to all the equitable rights of Homans, in the balance due on the notes after satisfying the claim of the bank, and nothing more. They stand in Homans’ shoes as to this controversy, and any equitable relief that Hemingray would be entitled to as against Homans if he was insolvent and suing for such balance, can be asserted against his assignees.
First. Before noticing the controverted items of set-off, I may say there is one item of one thousand dollars that is not controverted. It is the proceeds of the T. J. Allen note, which was the individual property of Hemingray. It was collected by Homams on the day of his failure, and credited to the account of R. Hemingray & Co., as was the custom in such cases, and reported the next day.
The right of Hemingray to have this item set off in this -case is so manifest, that counsel for the trustees, in their argument, “ admit that the collection from Allen should be set off against our client’s claims.” See Miller v. Florer, 15 Ohio St. 148.
With the exception of this item, it is contended that none of the others can be set off against the separate debt of Hemingray, because (1) the firm account of R. Hemingray & Co. is joint, and (2) because the assignment of the several deposit accounts of Hemingray by the checks, were void under the bankrupt law.
We will first ascertain the equitable rights of the parties, without reference to the checks.
The general rule in equity, as at law, is, that joint debts ■can not be set off against separate debts, unless there be .some special equity or equities to justify it.
Such special equities may arise under circumstances of *390 fraud; or where there are a series of transactions in which joint credit is given with reference to the separate debt; or where the mode or course of dealing is such as to furnish a presumption that there was an agreement that the- mutual dealings on each side, and independent debts, were to be set off against each other, and that, without such right of retaining against each other, the parties would not have-continued dealing with each other. Greene v. Darling, 5 Mason, 201; Downam v. Mathers, Prec. Ch., 580; Brewster v. Norcross, 17 N. J. Eq. 219.
Second. There are grounds upon which we think Hemingray is entitled to the relief he asks, not only as to the note due, but also as to those not due at the time of Ho-mans’ failure and assignment.
If Hemingray, as against Homans or his assignees, has a right to set off the amount due on the deposit account of the firm in Homans’ bank, against the balance due on the notes, which will be noticed presently, then the insolvency of Homans is a sufficient ground for the allowance of the set-off in equity, even as against the notes not due at the time of his failure and assignment. Pomeroy on Remedies and Remedial Rights, § 163; Waterman on Set-off, § 131; Smith v. Felton, 43 N. Y. 419.
This being so, we think that Homans induced the firm of Hemingray & Go. to continue the very deposits in question with him under circumstances of deception amounting to a fraud; and that this, in connection with the course of dealing between the parties, is sufficient to raise those special equities in favor of Hemingray, which entitle him to set off the firm deposit account against the balance due to Homans or his assignees on any or all of the notes.
The deception practiced by Homans consisted in holding himself out to Hemingray and the firm of Hemingray & Co., as being the owner and holder of the notes in question, by sending the usual bank notice of the maturing of the note falling due in July, 1869, from his bank, and he admits, in-his testimony, that this was an indication to Hemingray,, and also to his firm, to which the notice was sent, that the *391 note was then in his bank, although he had parted with the notes six weeks before. When Evans called and arranged with Iiomans for an extension of time on the note then falling due, the latter did not disclose, as he should have done, the fact that he had assigned the note to the Second National Bank, but on the contrary acted in such a way as to leave Evans to infer that he was still the owner and holder of the note. We think the confidence which Hemingray and his firm had in Homans was measureably due to their belief that he still held the notes, and that they were thereby induced to continue their deposits with him. On his examination as a witness, Homans, was asked this question : “ Did you not withhold from Captain Evans at that interview, and withhold from Mr. Hemingray up to the time of your failure, information that you had parted with Hemingray’s notes, for fear, if that fact became known to them, E. Hemingray & Co. would withdraw their deposits from your bank ?”
His answer was: “Yes.” We think his fears as here indicated were well founded; and that if the firm had known that he had assigned the notes as a security for a debt, it would have alarmed them, and they would at once have withdrawn not only a sum sufficient to pay the note then due, which was the subject of the special arrangement, but also the entire deposit account of the firm, and thus the firm and Hemingray would have quietly secured a sum greater than that now in litigation. The deception was clearly intentional on Homans’ part, and greatly prejudicial to Hemingray and his firm. On this state of facts alone, a court of equity would perhaps be authorized to grant the relief asked in respect to the note past due; but it is unnecessary to consider this point separately, as we think the deception which was practiced affected Hemingray and liis firm prejudicially as to the entire amount of the deposit account of the firm; and that the relief sought ought, therefore, to extend not only to the note past due, but also to those not due at the time of Homans’ assignment, if there are additional facts which will authorize a court of *392 equity to prevent gross injustice, by setting off against Ilemingray’s individual notes, the deposit account of the firm to an amount necessary to extinguish the balance due on the notes. We think there are such additional facts, i.e. that the course of dealing between the parties; the predominant interest of Hemingray in the firm; that he kept no individual bank account anywhere; that all his individual collections were made, and all his individual debts paid through the firm account; that the first note of the series had been paid through the firm account, and a rebate of interest on the note voluntarily allowed by Homans, on account of the firm deposit; that the payment of the secoud note of the series through the firm account had beén actually arranged for; that the firm considered it their duty to take care of the individual obligations of Hemingray, all of which go to show that there was an implied agreement between the members of the firm, that Hemingray might treat the bank account as his own in the payment of his individual debts, all of which was known to, acquiesced in, and acted upon by Homans. Therefore, although the deposit account is joint in form, we feel justified in regarding it as a separate demand in favor of Hemingray against Homans, which may be set off in equity against the balance due to Homans or his assignees on all the notes, without respect to the checks by which the account was transferred to Hemingray. And this renders the consideration of the questions raised, in reference to the effect of these checks upon the rights of the parties under the provisions of the bankrupt law, unnecessaiy.
Third. With reference to the deposit account that Captain Evans had in Homans’ bank, and which he assigned to Hemingray, it is sufficient to say, that the record shows that the proceeds of the Allen note, and the deposit account of the firm of Hemingray & Co. are more than will be required to set off the balance remaining due upon the notes of Hemingray, which renders the consideration of this item of set-off unnecessary. We therefore express no opinion upon it.
*393 Fourth. The SecondNational Bank, afterhavingbeen paid the full amount of Homans’ debt to it, which was collaterally secured, in part, by the notes in question, now moves ihe court that it may be allowed to collect from the balance yet due on the notes, an additional sum equal to the amount of the fees of its attorneys in the prosecution of this suit.
The motion must be denied.
In an action on a negotiable note which the plaintiff holds by assignment before due, as collateral security for a loan made by him to the insolvent payee,-against whom the maker holds an equitable set-off’ to the note, the plaintiff will be limited in his recovery against the maker to the amount of the debt which the note secures; and will not, in addition thereto, as against the maker, be allowed the amount of his attorneys’ fees for prosecuting the action.
In other words, as against the maker, who has a valid ■equitable defense to a note in the hands of the payee, if the latter pledges it as security for a debt, the pledgee can ■only be regarded as a bona fide holder of the note, to the extent of his interest at the time he acquires the title, or has notice of the defense to it. If the pledgee sues the maker upon the note, the latter may attempt a complete defense, without, in case of failure, thereby incurring a liability to pay to the pledgee anything in addition to the amount of the debt secured by the note.
The set-off as to the proceeds of the Allen note, and the -deposit account of the firm, is allowed in favor of Hemingray against the assignees in bankruptcy of Homans. The motion of the Second National Bank to be allowed the attorneys’ fees in this case is overruled.

Judgment accordingly.

Boynton, J., dissented from the allowance of the set-off', •except as to the amount of the note falling due July 14, 1869.